UNITED STATES *v.* NORTHERN PAC. R. CO. *et al.*

*(Circuit Court, D. Oregon.)*

1. PUBLIC LANDS—RAILROAD GRANT—NORTHERN PACIFIC—LOCATION OF ROUTE.
   Act Cong. July 2, 1864, granted public lands to the N. P. R. Co., and authorized it to construct a continuous line from Lake Superior, westerly, by the most eligible route, to be determined by said company, within the United States and on a line north of the forty-fifth degree of latitude, to some point on Puget sound, with a branch via the valley of the Columbia river to a point at or near Portland, Or. *Held,* that it was optional with the company whether it would build the branch to Portland. The clause giving it authority to do so did not limit its right to choose any route, within the prescribed limits, between Lake Superior and Puget sound.
2. SAME—APPROVAL OF LOCATION.
   Act Cong. May 31, 1870, authorizing said company to locate and construct, under the provisions and with the privileges and grants provided in its act of incorporation, (Act Cong. July 2, 1864,) its main line to Puget sound via the Columbia river, etc., is an approval and confirmation of the location of its line theretofore made by the company from Lake Superior via the Columbia river and Portland to Puget sound.
3. SAME—GRANT IN PRÆSENTI.
   The donation of land to said company under Act Cong. July 2, 1864, was a grant *in præsenti,* and took effect as of that date upon the subsequent location by the company of its road, and approval thereof by congress.
4. SAME—EFFECT OF DONATION—FILING OF MAP.
   Section 6 of said act provides that the president shall cause the lands to be surveyed for 40 miles on each side of the entire line of the road after the general route shall be fixed, "and the odd sections of land hereby granted shall not be liable to sale, entry, or pre-emption before or after they are surveyed, except by said company." *Held,* that the act withdrew the lands from liability to pre-emption after the route should be fixed; and, on the filing by the company of a map of the route with the secretary of the interior, the grant became certain, and attached to the odd sections of the land within the 40-mile limit.
5. SAME—NEGLECT OF SECRETARY OF THE INTERIOR.
   When the route was adopted by the company, and a map designating it was filed with the secretary of the interior, the route became fixed, within the meaning of the act; and no subsequent neglect of the secretary could affect the rights of the company.

At Law.

This is a suit to recover the value of timber cut in 1886 upon the N. W. ¼ of section 17, township 18, range 4 W. of the Willamette meridian, alleged to be public lands. The defense, is, that the said land was not

public land, but was owned in fee-simple by one Aaron Kinney, and that the timber was cut by the authority of said Kinney. The ownership of the land is the main issue in the case. The land was claimed by the Northern Pacific Railroad Company to be a portion of the land granted to it by the act of congress of July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget sound, on the Pacific coast, by the northern route." 13 St. 365. The lands granted by this act were conveyed to trustees by trust-deed in due form, to secure bonds issued by the corporation to raise moneys to build the road, with power to sell, bearing date July 1, 1870. The trust-deed was made by authority of a joint resolution of congress approved May 31, 1870, (16 St. 378.) The trustees conveyed the land in question to James B. Montgomery on September 9, 1870, and by subsequent conveyances, whatever title vested in the Northern Pacific Railroad Company by said act and joint resolution of congress so conveyed to Montgomery became vested in said defendant, Aaron Kinney, and was in him at the time the timber in question was cut and removed. The timber was cut by authority of defendant, Kinney.

On March 6, 1865, in pursuance of the provisions of the said granting act of July 2, 1864, the president of the Northern Pacific Railroad Company, by direction of the company, forwarded to the secretary of the interior a map of the general route of the road from a point on Lake Superior, to a point on Puget sound, and in an accompanying communication said: "Under authority from the board of directors of the Northern Pacific Railroad Company, I have designated on the accompanying map, in red ink, the general line of their railroad from a point on Lake Superior in the state of Wisconsin, to a point on Puget sound in Washington Territory, via the Columbia river, adopted by said company as the line of its railroad, subject only to such variations as may be found necessary after more specific surveys," and asking that the lands granted to the company be withdrawn from sale in conformity with law. No action was taken by the interior department upon this map, or the accompanying request. The line of the route indicated ran in a westerly direction; was wholly north of the forty-fifth degree of north latitude, and within the territory of the United States. On August 13, 1870, the same company filed with the secretary of the interior, and with the commissioner of the land-office, another map showing the general route of its main line from a point on Puget sound following almost identically the same route as that indicated on the map filed March 6, 1865, and on the day of filing this last map, August 20, 1870, 20 sections of land per mile on each side of the line indicated by said map were withdrawn from sale by the secretary of the interior for the benefit of the said company, and on September 13, 1873, said company duly filed its map of definite location of the line of said road from Kalama to Tenino in Washington Territory, a distance of 65 miles. In 1871, 1872, and 1873 said railroad company constructed and completed its line of road from Kalama on the Columbia river, in Washington Territory in

a northerly direction to Tenino,—a distance of 65 miles, forming a portion of a direct line of road since completed, from Portland, Or., to Tacoma, on Puget sound, in said territory, the western terminus of said road. That portion of the railroad from Portland, up the Columbia river, to a point where the Northern Pacific Railroad strikes the Columbia has never been constructed by said company. The land in question is within Washington Territory, north of the forty-fifth parallel of north latitude, and is within 40 miles of the line selected by the Northern Pacific Railroad Company, for the *main line of its road* from Lake Superior to Puget sound by way of the valley of the Columbia river as indicated on the map forwarded to the secretary of the interior by said company on March 6, 1865, and is within 40 miles of the line selected, as the main line of its road down the Columbia river to Puget sound, as indicated on said map filed with the secretary of the interior on August 13, 1870, and is within 40 miles of the line of the road as definitely located and now constructed from Kalama to Tenino, and Tacoma on Puget sound. The road as constructed from Tacoma to Portland, runs for about half its distance by way of the valley of the Columbia river to Portland, the whole length of the said portion of the road being 105 miles. After the withdrawal by the secretary of the interior, of said lands, in the interest of the Northern Pacific Railroad Company, on August 13, 1870, the land department at Washington, and the department of the interior refused all applications for settlement, north of the Columbia river, within the limits of the said grant to the Northern Pacific Railroad Company, until the 9th day of November, 1885. The tract of land in question together with other lands was listed by the Northern Pacific Railroad Company, on March 31, 1885. On November 9, 1885, the general land-office rejected the said list including the land in question, so made by the Northern Pacific Railroad Company; and on October 29, 1887, the department of the interior, on appeal affirmed the rejection. The land in question had been withdrawn from sale by the land department, and the Northern Pacific Railroad Company had definitely located, constructed and put in operation its road from Kalama to Tacoma, at the time it executed by its trustees its deed to said land in question, to J. B. Montgomery,—the grantor of defendant, Kinney. In 1870 there was a corporation existing in Oregon, organized for the purpose as expressed in its articles of incorporation, of building a railroad from Portland, Or., through the Willamette valley, to the southern boundary of the state. An act of congress was passed May 4, 1870, granting lands to this company to aid in the construction of a road from a point near Forest Grove, on its road to the southern boundary of the state, to Astoria, this not being a part of the road designated in its articles of incorporation. 16 St. 94. The Oregon Central Railroad Company filed its acceptance of the grant May 4, 1870; and its map of definite location from Astoria, to Castor Creek, near Forest Grove, on January 31, 1872, but it has constructed no part of this line so located. The land in question lies within 20 miles of the line indicated in this map of location, but it is on the north side of the Columbia river, in Wash-

ington Territory, now a state. On January 31, 1885, congress, for failure to build the road, passed an act declaring the said grant to the Oregon Central Railroad Company forfeited. 23 St. 296.

*Louis L. McArthur,* U. S. Atty., for complainants.

*Rufus Mallory,* for defendants.

Before SAWYER, Circuit Judge.

SAWYER, J.. (*after stating the facts as above.*) The language of the act authorizing the Northern Pacific Railroad Company to construct a railroad is:

"Said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota, or Wisconsin; thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget's sound, with a branch, via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon, leaving the main trunk-line at the most suitable place, not more than three hundred miles from its western terminus." 13 St. 366.

The controlling question presented, is, whether, upon reaching the Columbia river, instead of crossing the Cascade mountain range between the Columbia and Puget sound, upon finding a more eligible route for its road, the company with its road could follow down the Columbia River valley to and past Portland, cross over, and go north to Puget sound, thereby altogether dispensing with its branch to Portland. In my judgment it was fully authorized to do so. The object of congress was to have a railroad constructed from some point on Lake Superior, to some point on Puget sound, and *upon the most eligible route.* No survey had yet been made in such manner as to determine the most desirable route. It was probably supposed that some reasonably practicable route might be found over the mountain range, and in that case it would probably be adopted. In that case also, it would be important to have a connection with Portland, the largest town in this new north-west. But congress put no such limitation as to the route, upon the corporation. The language of the act is broad and comprehensive, with but the few limitations expressed, and congress doubtless, expressed the limitations as it intended them to be. It authorized the corporation to "lay out, locate and construct * * * a continuous road." It was limited as to its beginning to some point on Lake Superior, but it might be in either Wisconsin, or Minnesota, leaving the largest discretion in the company to determine the starting-point. Having determined this point, the road was to run "thence westerly by the most eligible railroad route, as shall be determined by the company." But it is to be "within the United States," and "on a line north of the forty-fifth degree of latitude, to some point on Puget sound." These were the only limitations put upon the company's authority to locate its road. The corporation was to select the terminus on the Sound, as well as the point of commencement. It was to select the "most eligible railroad route," and the question of eligibil-

ity is to "be determined by said company," within the prescribed limits. It would be difficult to confer this authority in more specific, comprehensive terms. The company selected the route which appeared to it to be most eligible, after actual survey. It located its eastern terminus on Lake Superior, then ran its route in a westerly direction to the Columbia river, down that river, through Portland to Kalama, on the Columbia, then up the valley of another river to a point on Puget sound. This route, from the point selected, on Lake Superior, to the point selected on Puget sound, fulfilled all the requirements of the act of congress. It ran in westerly direction, from Lake Superior to Puget sound; it was the route "determined by said company" after thorough examination to be "the most eligible." It was all "within the territory of the United States," and was "on a line north of the forty-fifth degree of north latitude," all the way to the "point on Puget sound." The line selected therefore, in every particular fulfilled all the requirements and conditions of the statutory grant. It is true, that the selection of the line, obviated the necessity of building a branch to Portland, as the main line itself adopted carried the road to and through Portland. Both objects of congress were accomplished by one main line, no longer than a main line, on the other route and the branch together, if so long. But the company did not obligate itself to build a branch road to Portland at all. It simply had the right—an option—to do so had it been necessary or desirable. So, as there was water communication between the point where the main line thus selected struck the Columbia river, and Portland, and there was less need for haste on this section, in the construction of the road, the company found it more advantageous economical and speedy to first build the road on the two ends from Lake Superior, to the Columbia, and from Portland to the Sound, and those divisions of the road were first built and completed. If the company has failed to construct the division between Portland and the point where the eastern division intersects the Columbia river, it is doubtless, because while it was expending its energies and resources in the construction of these two divisions, eastern and western, another company stepped in and built the road up the Columbia river from Portland to a junction with the divisions of the road extending from Lake Superior to the Columbia. It seems clear that the company was authorized by the act of congress to locate their main line as they did. I do not think the authority to construct a branch by the valley of the Columbia to Portland, is any limitation of the right of the company to select what it deemed upon examination, to be the most eligible line for its main road, within the limits expressly designated. It is not a limitation in terms, and it would be a strained construction to infer such a limitation from language so indefinite, where the other provisions of the act are so explicit. It, simply, is a grant of a right to make a branch also, had it been necessary or desirable.

And congress itself, in its resolution of May 31, 1870, before any location by the Oregon Central Railroad Company (16 St. 378,) recognized and approved this location of the main line as having been properly made, after it had been adopted by the company, that resolution "authorizing

the Northern Pacific Railroad Company to issue its bonds for the construction of its road and to secure the same by mortgage, and for other purposes." This resolution in addition to empowering the company to issue bonds and mortgage its land, also, authorized it "to locate and construct under the provisions and with the privileges, grants and duties provided for in its act of incorporation (the said act of 1864) its main road to Puget sound via the Columbia river, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade mountains to Puget sound." Could there be a plainer recognition and approval of the location of the main line down the Columbia river as having been properly made under the provisions of the incorporation act? This is a legislative construction of the act, corresponding to that given to it by the corporation. At all events it confirms the locations, and the confirmation relates back to the date of the location and even to the date of the act. I feel no hesitation in saying that the location was legally and properly made under the act, and if not, that this resolution confirms it. The grant then, dates from July 2, 1864.

The first map of general location of this portion of the line was filed in the interior department in March, 1865. True the secretary of the interior did not on this occasion give notice of a withdrawal of the lands from pre-emption sale, etc. But then the statute did not require him to do so. But section 6 provides that "the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act." Thus the act itself withdrew the lands upon the filing of the map or "after the general route shall have been fixed," which was done by the filing of the map of the route selected. The company, by filing the map, had indicated its line and the grant, before uncertain, now became certain, and attached to the odd sections of the land within the 40-mile limit. No notice was required to be given by the secretary. *Buttz* v. *Railroad Co.*, 119 U. S. 55, 7 Sup. Ct. Rep. 100; *Denny* v. *Dodson*, 13 Sawy. 84, 32 Fed. Rep. 899. But if notice had been provided for, the failure of the secretary to act, would not have affected the rights of the company after it had performed its part. The neglect of the secretary of the interior would not impair the company's rights. *Van Wyck* v. *Knevals*, 106 U. S. 366, 1 Sup. Ct. Rep. 336. And in this case as we have seen, "after the general route shall be fixed," the odd sections are not liable to grant to any other party, and the general route was fixed within the meaning of the act on the filing of the map in March, 1865. Another map, designating the same line was filed August 13, 1870, upon which upon the same day, the secretary of the interior formally withdrew the lands, and issued his notice, and the road was actually constructed and completed on this line in the years 1871–2 and 3. The title therefore, became indefeasible, the conditions subsequent as to this part of the line, having been fully

performed. The grant to the Oregon Central Railroad Company was not made till May 4, 1870, long after the grant to the Northern Pacific Company, and the filing of its first map of general location. And it did not file its map of location till January 31, 1872, when for the first time it became definite. This was long after the filing of its second map by the Northern Pacific Company, and long after the passage of the resolution of congress of May 31, 1870, recognizing and approving the location of its main route via the Columbia river and adjacent to the land in question; and if there was any defect before, the approval operated by relation and took effect from the date of the first act, and the location under it. Besides the Oregon Central Railroad Company never built the branch of its road, or any part of it, and congress passed an act declaring its right, whatever it was, forfeited, on January 31, 1885. The grant to the Northern Pacific Railroad Company therefore, first attached, and there was nothing left upon which the grant to the Oregon Central could operate, either at the date of the filing of its map of location in January, 1872, or at the date of the granting act, May 4, 1870. It does not appear that the Northern Pacific Railroad Company ever accepted or acted under the joint resolution of April 10, 1869, (16 St. 57,) and it is understood that it did not, but declined to accept it. There is no presumption without evidence that it did accept any rights under it.

The grant to the **Northern Pacific Railroad Company** was a grant *in præsenti*, subject only to be defeated by a failure to perform the conditions subsequent, and by proper proceeding taken on the part of the United States to divest the title and revest it in the government. But the conditions having been fully complied with, so far as this portion of the road was concerned, the title has now become perfect and indefeasible. The title is now, and it was at the time of the cutting of the timber in question perfect in the defendant, Kinney, the holder of the title of grantee of the Northern Pacific Railroad Company.

As to the last point I have recently gone over the whole subject in the case of *Francoeur* v. *Newhouse*, 14 Sawy. ——, 40 Fed. Rep. 618, and cited the numerous authorities on the points decided to which and the authorities therein cited, reference is made without going over the subject again. See also the opinion of Mr. Justice FIELD in *Denny* v. *Dodson*, 13 Sawy. 69, 32 Fed. Rep. 899, and the opinion of this court in *U. S.* v. *Road Co.*, 40 Fed. Rep. 114, (recently decided.)

The result is, that the plaintiff had no title to, or interest in the land in question, at the time of the timber-cutting complained of, and there must be judgment for defendants. It is so ordered. Let the finding of fact, be in accordance with the statement preceding this opinion, and in the stipulation of the parties, as to the facts, on file in the case.