UNITED STATES v. NORTHERN PAC. R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 10, 1899.)

No. 1,259.

1. PUBLIC LANDS—NORTHERN PACIFIC RAILROAD GRANT—IMPEACHMENT OF PATENT.

The action of the land department of the United States in determining the right of the Northern Pacific Railroad Company to public lands under its grant, and in issuing patents therefor, was within its jurisdiction, and a patent so issued conveys the legal title, and is valid, unless avoided for error, mistake, or fraud.

2. SAME—REVIEW OF DECISIONS OF LAND DEPARTMENT.

Decisions of the land department on questions of fact are conclusive on the courts, even in direct proceedings to set aside a patent, unless it is made to clearly appear that they were induced by fraud or mistake; and the nature of the mistake and manner of its occurrence or the particulars of the fraud must be pleaded and proved.

**3. SAME—CONSTRUCTION OF NORTHERN PACIFIC GRANT—EASTERN TERMINUS OF ROAD.**

Under section 1 of the act of July 2, 1864 (13 Stat. 365), granting lands to aid in the construction of the Northern Pacific Railroad, which authorized the company to construct its road "beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin: thence westerly by the most eligible railroad route  *  *  *  to some point on Puget's Sound," and making a grant of lands on either side of its road as so constructed, the company had the power to select the city of Ashland, which is in Wisconsin, on Lake Superior, and has a sufficient harbor, as the eastern terminus of its line: and such power was not affected by the fact that its road touched Lake Superior at more westerly points, to which it was first built.

**4. SAME.**

Under such act the railroad company had the right to select its terminus at any time within the limit of time fixed by the act, or by subsequent extensions, for the completion of the road, and it was not concluded as to such terminus until its selection had been communicated to and approved by the land department, which had the same power to approve or reject its selection of a terminus as of its route.

**5. SAME.**

The company, by resolution of its board of directors, on December 3, 1884, selected as the eastern terminus of its road a point in the city of Ashland, Wis. It had taken no previous action which precluded it from then making a selection, and when such selection was approved by the land department the legal terminus of the road was thereby fixed.

**6. SAME.**

The Northern Pacific Railroad Company had the power, incidental to the general purpose of its charter, to make a trackage arrangement for running its trains into Duluth before the construction of its own road to a point on Lake Superior; and the fact that it made such an arrangement with the Lake Superior & Mississippi Railroad Company, by which it acquired a half interest in a portion of the latter's track, over which it ran its trains during the construction period of its road, did not constitute a consolidation of the two companies, or a selection by the Northern Pacific of Duluth as its eastern terminus, which precluded it from afterwards extending its own road under its charter, and within the terms of its land grant, from its then terminus to Ashland, and selecting that place ʰas its terminus.

**7. EQUITY—RIGHTS OF UNITED STATES.**

The equities of the United States appeal to the conscience of the chancellor with no greater or less force than do those of a private individual under like circumstances. The same fundamental rules of right and justice govern nations, municipalities, corporations, and individuals.

**8. PUBLIC LANDS—WAIVER OF DELAY IN COMPLETION OF ROAD.**

The fact that the railroad company did not file its map of the definite location of its line as extended eastward, or construct such line or select its eastern terminus, until after the time fixed by the acts of congress for the completion of its road had expired, will not afford ground on which a court of equity, at suit of the United States, will cancel a patent for lands issued under the grant on account of such extension, where no action of congress looking to a forfeiture was taken, the map of route and selection of terminus were approved by the land department, and the road, when built, was examined and accepted, and the patent issued thereon. Such action by the government was a waiver of the default, which, when the road had been constructed on the faith of it, and the patent issued, became irrevocable.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This is an appeal from a decree which dismissed a bill brought by the United States to avoid a patent to a tract of land which was issued to the Northern Pacific Railroad Company by the land department of the government "under

the erroneous impression and mistaken belief," as the appellant averred. that it was within the limits of the congressional grant to that company. This land was selected by the appellee, and patented to it by the government, in lieu of a lost tract of land which was within the place limits of its grant if that grant extended to Ashland, in the state of Wisconsin, and which was not within its grant unless that grant extended east of Duluth, in the state of Minnesota; and the government claims that the mistake of the land department was that it found that the eastern terminus of the Northern Pacific Railroad was at Ashland, when it should have held that it was at Duluth; and it is conceded on all hands that the patent was properly issued if the finding of the department on this question was right. The following facts relative to this issue are established: On July 2, 1864, congress passed "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound on the Pacific coast by the northern route." 13 Stat. 365. By the first section of that act certain persons therein named and their associates were created a corporation by the name Northern Pacific Railroad Company. One portion of the section read: "And said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin; thence westerly by the most eligible railroad route as shall be determined by said company within the territory of the United States on a line north of the forty-fifth degree of latitude to some point on Puget's Sound, with a branch via the valley of the Columbia river," etc.; and it provided that the capital stock of the corporation should consist of 1,000,000 shares of $100 each. By section 3 of the act there was granted to the corporation every alternate section of public land not mineral, to the amount of 10 alternate sections per mile, on each side of the railroad line it should adopt through any state, with indemnity lands not more than 10 miles beyond the limits of the alternate sections; and this section contained these provisos: "Provided, that if said route shall be found upon the line of any other railroad route to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act. Provided further, that the railroad company receiving the previous grant of land may assign their interest to said Northern Pacific Railroad Company or may consolidate, confederate and associate with said company upon the terms named in the first section of this act." Section 4 of the act provided that whenever a section of 25 miles of the railroad was completed commissioners appointed by the president should examine it, and, if it appeared to have been built as required by the act, they should so report, and thereupon patents to lands appertaining to such section should be issued. Section 5 required the railroad to be constructed and equipped as a first-class railroad, and contained this sentence: "And it shall be the duty of the Northern Pacific Railroad Company to permit any other railroad which shall be authorized to be built in the United States, or by the legislature of any territory or state in which the same may be situated, to form running connections with it, on fair and equitable terms." Section 8 provided "that each and every grant and privilege herein are so made and given to, and accepted by, said Northern Pacific Railroad Company upon and subject to" the condition that it should complete and equip the railroad by the 4th day of July, A. D. 1876. The time for its completion was, however, subsequently extended to July 4, 1880. 14 Stat. 355; 15 Stat. 255. Section 18 provided that the company should obtain the consent of the legislature of any state through which any portion of its railroad should pass previous to commencing the construction thereof.

By the act of May 5, 1864 (13 Stat. 64), congress had granted to the state of Minnesota, for the purpose of aiding in the construction of a railroad from St. Paul to the head of Lake Superior, five alternate sections of land per mile on each side of that railroad. The state of Minnesota transferred this grant to the Lake Superior & Mississippi Railroad Company, and that company constructed the railroad from St. Paul to Duluth by way of Thomson, where the Northern Pacific Railroad subsequently crossed it. On May 5, 1864, congress granted to the state of Wisconsin to aid in the construction of a railroad from

Portage City, Berlin, Doty's Island, or Fond du Lac, to Bayfield, and thence to Superior, every alternate section of land for 10 sections in width on each side of the railroad. 13 Stat. 67. This grant was transferred by the state of Wisconsin to the Portage, Winnebago & Superior Railroad Company, which filed its map of definite location on November 10, 1869, and thereupon the lands within the limits of the grant were withdrawn from settlement and entry, and so remained until after the Northern Pacific Railroad Company filed its map of definite location of July 6, 1882. That portion of this railroad from Bayfield to Superior never was built, but it was on the same general route as a portion of the road of the Northern Pacific Railroad Company from Thomson to Ashland. On March 2, 1865, the legislature of the state of Minnesota passed an act which gave to the Northern Pacific Railroad Company all the powers, rights, and privileges in the state of Minnesota which had been conferred upon it in the territories of the United States by the act of congress, subject to a proviso that if it elected to make the eastern terminus of its road east of the state of Minnesota, it should construct or cause to be constructed a line of railroad from its main line to the navigable waters of Lake Superior in the state of Minnesota. Sp. Laws Minn. 1865, p. 228. On April 10, 1865, the legislature of the state of Wisconsin passed an act which vested this corporation with the same powers and privileges in the state of Wisconsin which it had under the act of congress in the territories. Priv. Laws Wis. 1865, c. 485. On March 25, 1872, that legislature passed an act amendatory of chapter 485 of the Laws of 1865, which provided that the Northern Pacific Railroad Company should not be permitted to construct, maintain, or operate any railroad in any part of the state of Wisconsin, except in Pierce and St. Croix counties, unless it constructed and maintained a line of railroad connecting with and continuous to its main line by a route running south of the St. Louis river from the junction of its railroad with the Lake Superior & Mississippi Railroad, intersecting the western boundary of Wisconsin at some point between the St. Louis and Nemadji rivers, and running thence all the way in Wisconsin to some point on the southwesterly shore of the Bay of Superior between Nemadji river and Connor's Point. Priv. Laws Wis. 1872, c. 139. On March 6, 1865, Josiah Perham, the president of the Northern Pacific Railroad Company, filed with the secretary of the interior a letter and a map. In the letter he wrote to the secretary that by authority of the board of directors he had designated on the accompanying map, in red ink, the general line of the railroad from a point on Lake Superior, in the state of Wisconsin, to a point on Puget Sound, in Washington Territory. The point on Lake Superior in the state of Wisconsin from which the red line on this map extended was at the mouth of the Montreal river, on the eastern boundary of that state, but this line from that point to a point in North Dakota is covered by a wavy red line, and another and heavier red line extends from that point in North Dakota to a point on the north shore of Lake Superior in Minnesota. The secretary of the interior sent this map to the commissioner of the general land office with a statement that he thought that the odd-numbered sections for 10 miles in width on each side of the line in Minnesota and Wisconsin should be withdrawn from entry and settlement. In June, 1865, the commissioner declined, in a letter to the secretary, to make the withdrawal, and no further action was ever taken upon this map. Perham does not appear to have had any authority from the board of directors to designate the line of the railroad or to, file the map. Prior to August 13, 1870, the board of directors of the Northern Pacific Railroad Company adopted the general route of its railroad through Wisconsin and Minnesota, and on that day filed a map thereof in the office of the commissioner of the general land office. Upon that map the line of the railroad extends from a point on Lake Superior, at the mouth of the Montreal river, on the eastern boundary of the state of Wisconsin, upon a direct line a little south of west to a point about six miles distant from the south end of Chequemagon Bay; thence a little north of west upon a line which passes about eight miles south of Superior, crosses the west line of the state of Wisconsin a few miles south of the point where the St. Louis river meets that line, crosses the Lake Superior & Mississippi Railroad at or near Thomson, and continues thence westerly to Wallula, in the state of Washington. This map was accepted by the secretary of the interior and the commissioner of the general land office, and the odd-numbered sections

within the limits of the land grant on each side of the line on this map in the states of Wisconsin and Minnesota were withdrawn from entry and sale, and the even-numbered sections were raised in price to $2.50 per acre, and large quantities thereof have been sold at that price. On November 21, 1871, the railroad company filed with the commissioner of the general land office a map of the definite location of its railroad from Thomson, on the Lake Superior & Mississippi Railroad, westerly to the Red River of the North on the same general route indicated on the map of August 13, 1870. In the summer of 1870 the Lake Superior & Mississippi Railroad from St. Paul to Duluth had been built. The general direction of this road is north and south, but from Thomson to Duluth, a distance of 26 miles, it runs more to the east than to the north. The construction of a railroad from Thomson to Lake Superior was expensive and difficult. Thomson was many hundred feet above the lake, on a plateau, whose eastern slope was rocky, uneven, and full of ravines. .

The general route of the Northern Pacific road, as shown on the maps of 1870 and 1871, and as it has since been constructed, is east and west, and it crosses the Lake Superior & Mississippi road at Thomson. The Northern Pacific Company did not commence at Lake Superior, and build the portion of its line east of Thomson first, but it began the construction of its railroad at Thomson, in 1870, and built westerly to a point 55 miles west of Helena, in the state of Montana, where, in 1883, this portion of the road was joined with a portion which had been constructed from Wallula, in the state of Washington, east to that point. In 1881 and 1882 it built its railroad from Thomson eastward to Bluff creek, in the city of Superior, on Lake Superior, and prior to 1885 it completed it from Thomson to a point in the city of Ashland, on Lake Superior, which its board of directors resolved was its eastern terminus. In 1885, 1886, and 1887 it constructed its line from near Wallula across the Cascade Mountains to the city of Tacoma, and the entire road was completed in August, 1887, and was accepted by the president. During the construction of its railroad the Northern Pacific Company formed and maintained running connections with the Lake Superior & Mississippi Railroad Company over the 26 miles of the latter's road from Thomson to Duluth in this way: On July 9, 1870, it agreed with the Lake Superior & Mississippi Company and two land companies that it would connect its railroad with that of the latter company at Thomson, so as to open and maintain direct connection by rail with Duluth, and so as to enable that city to be one of its principal points of trade and transshipment on Lake Superior; that it would enter into equitable and just running arrangements with the latter company to accomplish this object; that it would make its first connection east from the point of intersection of the two roads by way of the line of the Lake Superior & Mississippi Company over Rice's or Minnesota Point; and that it would not build any other road so as to form a connection running eastward of the road of the latter company north of Wyoming (a town on that road) previous to the completion of its road to the Missouri river. The other parties to this contract agreed to furnish the Northern Pacific Company certain land in and about Duluth and Thomson for shops, depots, stations, and other railroad purposes. This agreement was performed. On January 1, 1872, the Lake Superior & Mississippi Railroad Company conveyed an undivided half of its road from Thomson to Duluth, and of its appurtenances, to the Northern Pacific Company, by a deed which recited that the latter company was authorized to construct and operate an independent line which would run into and through Duluth, and terminate at a point adjoining the terminus of the Lake Superior & Mississippi Railroad, and that the Northern Pacific Company agreed to purchase the half of the 26 miles of railroad to obviate the necessity for its construction of a railroad from Thomson to Duluth. At the time this deed was made the two companies entered into an agreement for the joint operation of this railroad from Thomson to Duluth. On May 1, 1872, the Lake Superior & Mississippi Company leased its entire road to the Northern Pacific Company for 999 years, and on April 21, 1874, that lease was surrendered and renounced by mutual agreement. It was suggested in 1873 that the effect of the deed and agreement of January 1, 1872, was to fix the eastern terminus of the Northern Pacific Railroad at Duluth, and thereupon, at the request of the Northern Pacific Company, the board of directors of the Lake Superior & Mississippi Company by resolution agreed with the

Northern Pacific Company that this was not the effect of their agreement, or the intention of the parties to it. From the 1st day of January, 1872, to the 1st day of January, 1886, the Northern Pacific Company sent its engines and trains over and operated the 26 miles of railroad from Thomson to Duluth under the agreements we have recited, but it then abandoned, and has not since used, that road, and it never asked or received any lands under its grant on account of it. The railroad from Thomson to Ashland, which was constructed in 1881, 1882, 1883, and 1884, was duly examined and approved as a part of the railroad of the Northern Pacific Company by commissioners appointed by the president under the act of July 2, 1864, and the land grant was adjusted, and the lands within the limits of the grant along that line east of Thomson, including the tract here in controversy, were patented to the Northern Pacific Company accordingly. On July 3, 1882, the Northern Pacific Company transmitted to the secretary of the interior the map of the definite location of its railroad from Thomson to a point in section 15, township 47 N., range 2 W.. in the state of Wisconsin, about 10 miles west of the mouth of the Montreal river. The line of definite location shown on this map followed the general route marked out on the map of August 13, 1870, but it turned to the north at Superior and at Ashland, so as to reach Lake Superior at those cities. This map of definite location was accepted, the land grant was adjusted to the line there shown, and the lands appertaining to this portion of the road were withdrawn from sale and entry in 1883 by direction of the secretary of the interior. The railroad was constructed from Thomson to Ashland on this line with slight and permissible variations. On August 28, 1884, the board of directors of the Northern Pacific Company passed, and on December 3, 1884, transmitted a copy of this resolution to the commissioner of the general land office: "Resolved, that the eastern terminus or the point of beginning of the Northern Pacific Railroad on Lake Superior be, and the same is hereby, fixed, determined, and established at a point at the city of Ashland, on Lake Superior, in the county of Ashland, in the state of Wisconsin, in section 27, township 48 north, range 4 west of the fourth principal meridian." The point named in this resolution is about one mile north of the line of definite location shown on the map of July 6, 1882, and about twelve miles west of the most easterly point shown on that line. The officers of the land department accepted this resolution as a selection by the company of the eastern terminus of the railroad. The road was constructed, the land grant was adjusted, and the lands within it were patented accordingly. From 1884 until 1895 the railroad company, the United States, and their respective officers held that Ashland was the eastern terminus of the Northern Pacific Railroad, and that the railroad from Thomson to Ashland was a part of the line constructed under, and entitled to the benefit of, the act of July 2, 1864. On August 27, 1896, the secretary of the interior discovered that the eastern terminus of this railroad was at Duluth, that the road from Thomson to Ashland was not a part of the railroad constructed under the act of congress, and that none of the lands on either side of it were within the grant made by that act. 23 Land Dec. Dep. Int. 204; 21 Land Dec. Dep. Int. 412.

Eugene G. Hay, for appellant.

James B. Kerr (C. W. Bunn, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This is a suit to avoid a patent issued to the Northern Pacific Railroad Company, the appellee, by the land department of the United States. The land department is a quasi judicial tribunal, and a patent is the judgment of that tribunal upon the questions presented, and a conveyance in execution of the judgment. When it is attacked, two questions are presented. They are: Did the department have jurisdiction to issue the patent and to determine the questions which

conditioned its issue? and, was its judgment induced by fraud, mistake of fact, or error in law? The limits of the jurisdiction of this department, and the classes of cases which fall within that jurisdiction, have been considered and stated by this court with some care in U. S. v. Winona & St. P. R. Co., 32 U. S. App. 272, 282–286, 15 C. C. A. 96, 103–107, and 67 Fed. 948, 955–959, to which reference is made for a more extended discussion of this subject. The rule, broadly stated, is that the land department has jurisdiction over every case in which the control and disposition of the land is intrusted to its care, and that its judgment in such a case, whether right or wrong, conveys the legal title to the patentee, and is valid, unless avoided for error, mistake, or fraud. The land in dispute in this case, and the tract of land in the place limits of the grant to this company, in lieu of which the patent to this land was issued, were intrusted to this department for disposition, and the power was granted to it, and the duty imposed upon it, to hear and determine the question who was entitled to the conveyance of this land from the government. Its judgment was therefore not without jurisdiction, and its patent conveyed the legal title.

The other question is: Was this patent void because the decision upon which it was based was induced by error, fraud, or mistake of fact? A court of equity has the power to set aside such a patent in a case in which the action of the department has resulted from a clear error of law. Bogan v. Mortgage Co., 27 U. S. App. 346, 350, 11 C. C. A. 128, 130, and 63 Fed. 192, 195, and cases there cited. Its decision of a question of fact, however, is conclusive, even in a direct proceeding to set aside the patent, unless it is first made to appear clearly that its adjudication was caused by a plain mistake or was induced by fraud or perjury. There is no general appeal from the officers of the land department to the courts; and the latter cannot review the decisions of questions of fact rendered by those officers in the absence of convincing proof that they were induced by fraud or mistake. U. S. v. Mackintosh, 56 U. S. App. 483, 490, 29 C. C. A. 176, 179, and 85 Fed. 333, 336; U. S. v. Budd, 144 U. S. 154, 168, 12 Sup. Ct. 575; Diller v. Hawley, 48 U. S. App. 462, 472, 26 C. C. A. 514, 518, and 81 Fed. 651, 655. The averment of the bill in this case is that the officers of the land department by mistake conveyed the land here in question to the Northern Pacific Railroad Company, under the erroneous belief that it was within the grant made to that company by its charter, the act of July 2, 1864 (13 Stat. 365). It is, however, conceded that if the eastern terminus of the railroad is in the city of Ashland, in the state of Wisconsin, this land was properly patented, and the real claim of the government is that the land department was mistaken in holding that Ashland was its eastern terminus, when it should have held that this terminus was at Duluth, or at Thomson, in the state of Minnesota, or at Superior, in the state of Wisconsin. In reaching the decision which resulted in the issue of this patent, the land department must have decided two questions, one a question of law,—whether or not the railroad company had the right under its charter to select Ashland as its eastern terminus; and the other a question of fact,—whether or not it did so select it. We will first consider the question of law.

When congress made the offer to Richard D. Rice and his associates of the grant of lands contained in the act of July 2, 1864, its primary purpose was to get the greatest amount of railroad, and not to save the largest amount of land. The region north of the forty-fifth degree of latitude, through which the road was to run, was practically unknown and uninhabited, and was popularly believed to be covered with ice and snow for more than half the year. The lands of the government along this line were unoccupied and unsalable, and without a railroad they would have been the abode of Indians and wild animals to this day. Congress recognized the fact that the wealth of a nation is not its trackless forests or barren prairies, but its industrious and prosperous citizens. The United States offered this grant of land for the construction of a railroad to the end that some of its useless lands might be sold, and that the region through which the railroad was to pass might be what it has since become,—the home of intelligent, loyal, and contented subjects. But it took good care, by doubling the price of the even-numbered sections within the limits of the grant, which it retained, that, while it secured to itself these inestimable advantages, it should incur no possible loss. The task was so gigantic, and its accomplishment so doubtful, that the offer contained in the act of 1864 failed to induce its performance, and congress was so anxious that the road should be built that in 1870 it extended the indemnity limits of the grant 10 miles on each side of the line. 16 Stat. 379. It is well to call these facts to mind when the object of the government has been attained, when the road has been constructed, and when, many years after the contract between the government and the company has been executed, its terms are to be construed. The intention of the parties in the making of this contract must be interpreted in the light of these facts and conditions which surrounded them when the agreement was made. Accumulator Co. v. Dubuque St. Ry. Co., 27 U. S. App. 364, 372, 12 C. C. A. 37, 42, and 64 Fed. 70, 74.

Let us now return to the question. Did the act of 1864 authorize the railroad company to select Ashland as its eastern terminus? Section 1 of that act empowered the corporation "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin; thence westerly by the most eligible railroad route * * * to some point on Puget's Sound." The city of Ashland is in the state of Wisconsin. It is on Lake Superior. It has a harbor fit for the terminus of a great railroad. The terms of the act are plain, and argument and exposition can add nothing to this statement. Since the eastern terminus of the road was not fixed by the act, and the charter gave the railroad company the unlimited power to locate it at any point on Lake Superior in Minnesota or Wisconsin, the conclusion is irresistible that the power to locate it in either state, and at any suitable city on the lake in either of these states, and hence to locate it at the city of Ashland, which has a safe and capacious harbor, and is an eligible point, was conferred upon the company by this charter. It is doubtful whether this power would ever have

been questioned if the decision of Secretary Lamar (4 Land Dec. Dep. Int. 458), subsequently approved in U. S. v. Southern Pac. R. Co., 146 U. S. 570, 596, 13 Sup. Ct. 152, had not been erroneously supposed to furnish some authority for the position that the Northern Pacific Company was limited in its selection of its eastern terminus either to the most westerly point, or to the first point on Lake Superior which its railroad reached. This was that case:  On July 27, 1866, congress passed an act which created the Atlantic & Pacific Railroad Company, authorized it to construct and operate a railroad from a point near the town of Springfield, in the state of Missouri, westward through Albuquerque, "and thence, along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado river, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route, to the Pacific"; and granted lands on each side of the line of the railroad to aid in its construction.  14 Stat. 292, c. 278.  The railroad company constructed its road to the Pacific Ocean at San Buena Ventura under this act, and filed maps of definite location of its line of railroad for a distance of 380 miles northward from this point along the Pacific coast to San Francisco, but it never constructed its railroad beyond San Buena Ventura.  Upon this state of facts Secretary Lamar held that the company had constructed its railroad "by the most practicable and eligible route to the Pacific" when it had built it to the Pacific Ocean at San Buena Ventura, and that it took no lands under its grant to aid in the construction of a railroad along the coast to other points. If, however, that act had empowered the company to build a railroad from Springfield, in the state of Missouri, to a point on the Pacific Ocean in the state of California, or in the state of Oregon, by the most eligible route to be selected by the company, and if that company had constructed its railroad to a capacious harbor in the state of Oregon, we apprehend that Secretary Lamar would not have hesitated to hold that the construction of such a railroad was authorized by the act, and that the land grant followed the road, even if it skirted the Pacific almost at right angles to the general route from San Buena Ventura to Oregon.  The Northern Pacific Company did not turn from the direction of its general route to reach the city of Ashland.  The general direction of the route of its railroad is east and west.  The south shore of Lake Superior from Duluth and Superior to Ashland extends in an easterly direction.  Ashland is about 60 miles east, and only about 12 miles south, of Superior. The primary purpose of the grant was to get the largest amount of railroad possible constructed, to open to settlement as much unoccupied territory as possible, not to save to the government the largest quantity of vacant land.  Witness the additional grant of 1870. The people of Minnesota and Wisconsin were anxiously endeavoring to compel the company to build as much railroad as possible in their respective states.  Witness the power to fix the initial point in either state inserted in the act of congress, and the acts of the legislatures of those states which required the company to connect the main line of its railroad with the cities of Duluth and Superior.

Sp. Laws Minn. 1865, p. 228; Priv. Laws Wis. 1872, c. 139. Every mile of railroad constructed opened to settlement and occupation lands that were uninhabited, and practically useless to the government. Turn this case as you will, look at the literal terms of the charter which themselves settle it, at the considerations which induced its enactment, or at the facts and conditions surrounding the parties when it was passed, or at all of them together, and the result is the same. The charter empowered the company to fix the eastern terminus of its railroad at Ashland, in the state of Wisconsin, and it constituted no objection to that power or to its exercise that the road was first built to or connected with Lake Superior at the city of Superior, at the city of Duluth, or at any other point, before it reached the terminus chosen by the corporation. Boston & P. R. Corp. v. Midland R. Co., 1 Gray, 340, 367; Fall River Iron-Works Co. v. Old Colony & F. R. R. Co., 5 Allen, 221, 227; U. S. v. Northern Pac. R. Co., 41 Fed. 842, 845; Railroad Co. v. Attorney General, 118 U. S. 682, 7 Sup. Ct. 66; Parke's Appeal, 64 Pa. St. 137. The land department committed no error of law when it held that this company had authority under its charter to locate its eastern terminus at Ashland.

The second question is: Did the land department make a mistake of fact when it found that the Northern Pacific Company actually selected Ashland as its eastern terminus? It will be conceded in the discussion of this question that the corporation could make but one selection, and that when it once made its choice its power in that regard was exhausted. But there were three essentials to a valid selection. They were a deliberate intention on the part of the company to make the choice, the clear expression of that intention to the land department of the United States, and the acceptance and approval of that selection by that department. There was no time fixed by the charter for the making of this choice short of that named for the completion of the road, and until the selection was made, and accepted by the government, the company undoubtedly had the same right to form and change its intention in this respect that it had relative to the definite location of the line of its railroad. In Land Co. v. Griffey, 143 U. S. 32, 39, 12 Sup. Ct. 364, Mr. Justice Brewer, in delivering the opinion of the supreme court, relative to the right of a company under a similar grant to change its intention as to the line of its railroad, said: "The fact that the company has surveyed and staked a line on the ground does not conclude it. It may survey and stake many, and finally determine the line upon which it will build by a comparison of the cost and advantages of each; and only when, by filing its map, it has communicated to the government the knowledge of its selected line, is it concluded by its action." And in the later case of Railroad Co. v. Smith, 171 U. S. 260, 264, 267, 18 Sup. Ct. 794, that court held that this company had the right to change the location of its right of way and the line of its railroad from that marked on its map of definite location at any time before the commissioners examined and approved the constructed railroad. No reason occurs to us why the company had not a similar right in the matter of the se-

lection of its eastern terminus. It is not perceived why this company had not the right to survey and stake lines, and under the additional powers granted, and in the performance of the additional tasks imposed by the legislatures of Minnesota and Wisconsin, to build and operate railroads to various points on Lake Superior, in those states, and finally to determine at which point it would fix its eastern terminus "by a comparison of the cost and advantages of each." It undoubtedly had this right, and only when it communicated to the land department its deliberate selection of that terminus, and only when that choice was accepted and approved by that department, was it finally concluded by its action. We say advisedly that only when the selection was accepted by the land department was it conclusive, because it was the undoubted duty of that department to consider this selection when it was communicated to it; to accept it if the point chosen was eligible, and to reject it if the place selected was on some bold, storm-swept promontory, or the marshy shore of a shallow bay, or in any other place where the transfer of passengers and freight from the railroad to vessels on the lake would have been either impossible or inconvenient. It was the province and duty of that department to hear and determine this question, just as it was its province and duty to determine whether or not the line which the company selected for its railroad was a reasonably direct and eligible railroad route, and whether or not it was north of the forty-fifth parallel of latitude; and its decision and judgment upon these questions was final and conclusive unless revised on appeal, or avoided for fraud or mistake in a direct proceeding for that purpose. Buttz v. Railroad Co., 119 U. S. 55, 72, 7 Sup. Ct. 100; Railway Co. v. Sage, 36 U. S. App. 340, 355, 17 C. C. A. 558, 567, and 71 Fed. 40, 49; Hartman v. Warren, 22 C. C. A. 30, 33, 76 Fed. 157, 159, 160, and 40 U. S. App. 245, 250.

It is contended by the counsel for the government that by the acts and contracts recited in the statement which precedes this opinion the Northern Pacific Company exercised its power of selection, and thereby (1) fixed the eastern terminus of its railroad at Duluth, in the state of Minnesota; (2) fixed that terminus at Superior City, in the state of Wisconsin; and (3) that by its delay until 1884 it forfeited its right to locate that terminus at Ashland. The fact remains, however, that the company never expressed to the land department any intention to select either Duluth or Superior as its eastern terminus, and that every map, plat, and communication which it sent to the government indicated its purpose to fix that terminus at least as far east as the city of Ashland. The letter and map of Perham, the president of the company, in 1865, with the letter of the secretary which transmitted the map to the commissioner, notwithstanding the wavy mark over the original line of the route, constitute convincing evidence that the line on that map which Perham marked terminated at the mouth of the Montreal river, on the eastern boundary of the state of Wisconsin, 20 miles east of Ashland, and at least 80 miles east of Superior and Duluth. We say these letters constitute convincing evidence of this fact, because the letter of Perham declares that the line extends from a point in Wisconsin and the letter of the

secretary recommends the withdrawal of the lands in that state. The map, however, does not seem to have been authorized by the board of directors of the company, and it was rejected by the commissioner. Still it shows the intention of the president of the company. The accepted map of the general route of August 13, 1870, upon which the lands were withdrawn, shows the route extending easterly to the mouth of the Montreal river. The map of definite location of that part of the line east of Thomson in the state of Minnesota shows the line of the railroad extending to a point about 14 miles east of Ashland. The resolution of the board of directors of August 20, 1884, "fixed and determined and established" the eastern terminus at a point on Lake Superior in the city of Ashland, which is specifically named in the resolution. These maps and this resolution of selection were communicated to and approved by the land department. The lands were patented in pursuance of that approval. The railroad was constructed to Ashland, was examined and approved by the commissioners appointed by the president, and has been in operation to that city for more than a decade. Here is indubitable proof of the purpose of this company to select the city of Ashland as the eastern terminus of its railroad, of the communication of that selection to the land department, and of the acceptance and approval of that choice by the government. There is no evidence in the case that the company ever selected, or intended to select, or that the land department ever approved, the selection of any other place. In view of these facts, what avenue of escape can there be from the conclusion which the land department reached, when it issued this patent, that the company had selected the city of Ashland for the eastern terminus of its road?

It is earnestly contended by the counsel for the government that by the agreements and deed recited in the statement preceding this opinion the Lake Superior & Mississippi Railroad Company "consolidated, confederated, and associated" in 1870 and 1872 with the Northern Pacific Railroad Company, under the second proviso of section 3 of the latter's charter, and that by this act, and by operating its trains over the 26 miles of railroad of the Lake Superior & Mississippi Company from Thomson to Duluth during its construction period from 1872 to 1886, the Northern Pacific Company selected Duluth as its terminus, and thereby exhausted its power to choose. The 26 miles of railroad which extended from Thomson to Duluth was less than one-fifth of the railroad of the Lake Superior & Mississippi Company, and it extended from Thomson, whence the Northern Pacific Company was constructing and operating its railroad westerly, in a northeasterly direction to Lake Superior at Duluth. The Northern Pacific Company had no railroad to the lake. It had undertaken a difficult, burdensome, and gigantic task, and a railroad down the broken and rocky hill from Thomson to Lake Superior was exceedingly difficult to construct, and expensive to maintain.

It is said that the agreements and deed between the two companies must have been a consolidation, confederation, and association, because the Northern Pacific Company had no power to make those agreements, or to accept that deed, except under the consolidation

proviso of section 3 of its charter. It is true that the powers of corporations are limited to those expressly granted and to those fairly incidental thereto, but it is also true that the incidental powers of a great railroad corporation like the Northern Pacific Company are ample without the proviso in section 3 to authorize it to make all the contracts with reference to this 26 miles of railroad which are found in the record, for the purpose of enabling it to operate its trains to the head of Lake Superior while it was constructing its railroad from Thomson to the Pacific Ocean. See Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 10 U. S. App. 98, 107, 196, 2 C. C. A. 174, 178, 234, 245, and 51 Fed. 313, 321, 331, where this court held that the incidental powers of such a corporation were sufficient to empower it to make a lease of the joint use of 36 miles of railroad from Lincoln to Beatrice, Neb., of several miles of railroad in the city of Omaha, and of terminal facilities in that city, for 999 years. Moreover, if there were any doubt about this proposition, it would be put at rest by the last clause of section 5 of the charter of this company, which reads: "And it shall be the duty of the Northern Pacific Railroad Company to permit any other railroad which shall be authorized to be built by the United States, or by the legislature of any territory or state in which the same may be situated, to form running connections with it on fair and equitable terms." Under this section of the charter it was the duty of this company to make equitable agreements for running connections with the Lake Superior & Mississippi Company, and the duty implied the power. Ample authority to make the trackage contracts and running arrangements in question may also be found in the act of the legislature of the state of Minnesota of March 2, 1865 (Sp. Laws Minn. 1865, p. 228). It is not necesary, therefore, to appeal to the proviso for consolidation, confederation, and association in section 3 to find authority for the acts and contracts of these two companies relative to the road from Thomson to Duluth.

Nor do these contracts, this deed of the undivided half of that railroad, and the operation of the railroad under them constitute an exercise of the power conferred by that proviso. It was only "on the terms named in the first section of the act" that this consolidation, confederation, and association could be made, and it could only be made by a consolidation of the Lake Superior & Mississippi Railroad Company into the Northern Pacific Railroad Company, not by a consolidation of the Northern Pacific Company into the Lake Superior & Mississippi Company. These restrictions upon this consolidation, confederation, and association mark one of the primary objects, and insure the accomplishment of one of the great purposes, of the charter, namely, that a single corporation, the corporation created by that charter, should, in the end, own and operate a continuous railroad from Lake Superior to Puget Sound, and be subject to the call of the government to transport its mails, its troops, and its munitions of war, and to discharge the other duties imposed by the act. The government did not make this land grant or propose to confirm or convey it to the lessee or part owner of the disjointed fragments of other railroads, but to the owner of an entire continuous railroad. It was to this end that congress studiously inserted in this proviso, not

that the railroad having the previous grant might lease its railroad to the Northern Pacific Company, or rent or buy a portion of that of the Northern Pacific Company, but that it might assign its interest to that company, or might consolidate, confederate, and associate with it on the terms mentioned in the first section of the act. It might assign its railroad to the Northern Pacific Company, and thereby that company would become the absolute owner of it, or it might unite with the Northern Pacific Company on the terms mentioned in the first section of the latter's charter, and, if it did unite with it on those terms, the same result would follow. In either event, the Northern Pacific Company would become the absolute owner of the road of the company having the previous grant. What were the terms mentioned in the first section of the act? They were, when read in connection with the proviso in the third section, that the company having the previous grant might become consolidated, associated, and confederated in some lawful way with Richard D. Rice and the other parties there named, or with their successors, "in a body corporate and politic under the name, title and style of the Northern Pacific Railroad Company," and that its interest should be represented by a proper proportion of the $100,000,000 of capital stock authorized by that section. It was an inexorable condition of the exercise of the power of assignment or of union conferred by the second proviso in section 3 of this charter that the ownership of the railroad having the previous grant should be vested in the Northern Pacific Railroad Company. Nothing of this character was ever done with the railroad of the Lake Superior & Mississippi Company, or with any part of it, the power conferred upon that company to consolidate, confederate, and associate with the Northern Pacific Company never was exercised, and the railroad of that company from Thomson to Duluth never became a part of the railroad constructed by the Northern Pacific Company under its charter.

In this connection the attention of the court has been challenged to the fact that by the agreement of July 9, 1870, the Northern Pacific Company contracted to make its first connection east from Thomson by way of the road of the Lake Superior & Mississippi Company, and agreed not to build any other road east of that railroad north of Wyoming before it completed its road to the Missouri river; to the fact that in the deed of January 1, 1872, there is a recital that the Northern Pacific Company is authorized to construct and operate a railroad which would run to Duluth, and terminate at a point adjoining the terminus of the Lake Superior & Mississippi Railroad, and that it had agreed to purchase an undivided half of the railroad of that company from Thomson to Duluth, "to the end that the necessity for the construction of the said Northern Pacific Railroad from the said point of connection to the city of Duluth may be obviated"; to the fact that the Northern Pacific Company operated its trains over this railroad for 14 years; and it is urged that these facts proved the intention of the company to make Duluth the eastern terminus of its railroad. It is at least doubtful whether or not these facts fairly indicate such an intention, for it will be noticed that the agreement not to construct a railroad east of the Lake Superior & Mississippi

Railroad until the Northern Pacific Company had constructed its line to the Missouri river strongly implied the purpose to construct one east of that road as soon as the construction to the Missouri river had been completed. But let it be conceded that in 1870 and in 1872 the Northern Pacific Company did have the intention to make the eastern terminus of its railroad at Duluth. Its purpose at that time is not now material. It had the right to form and to change its intention until it exercised its power and made its selection. It never selected Duluth, never communicated to the government the fact that it had made that selection, the land department never considered or approved the choice of that city as the terminus of this railroad, and the company never claimed and never received any lands on account of the railroad from Thomson to Duluth. The result is that this 26 miles of railroad never was a part of the railroad constructed under the charter of the Northern Pacific Company, and Duluth never was selected as, and never became, the eastern terminus of that railroad.

The next proposition of the United States is that the construction of the railroad from Thomson to the city of Superior in 1881 and 1882 fixed the eastern terminus of the road of the Northern Pacific Company at the latter city, and limited the land grant to that portion which pertains to the road west of that city. This position rests upon the theory, which in an earlier part of this opinion has been shown to be unsound, that the corporation was limited in its selection to the most westerly eligible point on Lake Superior, or to the point on that lake to which its railroad was first constructed. The charter contained no such limitation. It gave the company the unlimited right to choose any eligible point on the lake in the state of Minnesota or in the state of Wisconsin.

It is contended by counsel for the appellant that the Northern Pacific Company forfeited all its land grant pertaining to that portion of its railroad east of Thomson because it did not build this portion of its road, or file any map of definite location of that part of its line, or select Ashland as its eastern terminus, until after July 4, 1880. The argument here is based on section 8 of the charter, which provides that "each and every grant, right and privilege herein are so made and given to, and accepted by said Northern Pacific Railroad Company upon and subject to the following conditions," one of which, as amended by the subsequent joint resolutions, is that the company shall construct, equip, furnish, and complete its entire road by the 4th day of July, A. D. 1880. 14 Stat. 355; 15 Stat. 255. On July 4, 1880, that part of the railroad east of Thomson and that part of it west of Wallula, in the state of Washington, were not constructed. They have since been built, examined, and accepted. It is too well settled, however, to admit of discussion, that the fact that these portions of the railroad were not completed on July 4, 1880, did not ipso facto forfeit or impair any of the rights or privileges granted by this charter. The grant was in præsenti, and the condition was a condition subsequent, which was ineffective until by act of congress, or by the decree of a court of competent jurisdiction in a direct proceeding for that purpose, a forfeiture was declared. St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1,

11 Sup. Ct. 389; Schulenberg v. Harriman, 21 Wall. 44, 62; U. S. v. Southern Pac. R. Co., 146 U. S. 570, 606, 13 Sup. Ct. 152; Farnsworth v. Railroad Co., 92 U. S. 49, 67. Moreover, it is extremely doubtful, in view of the provisions of section 9 of the charter, whether or not any court would have jurisdiction to hear an application for or to declare a forfeiture in the absence of an act of congress directing such an application. That section provides that, if the company makes any breach of the conditions of the act, and allows the same to continue for upward of one year, "then in such case at any time hereafter the United States, by its congress, may do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road." Courts will hesitate long, we apprehend, to declare a forfeiture of the rights under this charter in the absence of any action by congress. However this may be, no act of forfeiture has ever been passed, no decree of forfeiture has ever been rendered. This is not a suit for that purpose. It is nothing but a suit to avoid a patent to a single tract of land on the sole ground that the land department erroneously found the eastern terminus of the road to be at Ashland, when it was at Duluth. No forfeiture of any of the rights and privileges of the company on account of the delay in the construction of its railroad has been prayed, no issue of forfeiture has been tendered or made by the pleadings, and that question is not here for consideration. It is a general rule that questions that are not within the issues presented by the pleadings may not be determined by the courts; much less may so important a question as the forfeiture of the rights of a corporation to thousands of miles of railroad and thousands of acres of land under a congressional grant. Courts have no jurisdiction to consider or determine the question of the forfeiture of a railroad land grant until it is raised by direct allegations in a suit instituted by lawful authority for the express purpose of presenting it.

It is said, however, that, if this condition was subsequent, still it was not complied with, and that this fact furnished good ground for the avoidance of this patent. Attention is called to the fact that the time for the completion of the road had expired long before the map of definite location of the line east of Thomson was filed on July 3, 1882, long before the eastern terminus of the road was located at Ashland by the resolution of December 3, 1884, and long before a mile of the railroad east of Thomson was constructed; and it is insisted that by the expiration of the time fixed for the construction the company lost its right to locate or construct that portion of the railroad east of Thomson, and its right to select its eastern terminus. There are two answers to this proposition which seem to us conclusive. In the first place, this is not a suit by the railroad company for the specific performance of the contract evidenced by its charter, and for a conveyance of this land. The United States is not defending such a suit on the ground that the railroad company has not performed its part of the agreement in time. The railroad company is asking no relief. This is a suit in equity, brought by the government itself to set aside the solemn judgment and conveyance of the quasi judicial tribunal to which it intrusted

the power, and on which it imposed the duty to hear and determine the very question whether or not the corporation was entitled to do these acts, and thereby to earn these lands, notwithstanding the fact that the time fixed for their performance had passed. That tribunal determined all these questions from time to time, as they were presented, in favor of the railroad company. When the map of definite location of this part of the line was filed in 1882, the land department accepted and approved it, and adjusted the land grant to the line there shown. When the resolution fixing the terminus at Ashland was filed, it accepted and approved that selection, and adjusted the land grant accordingly. As the railroad was constructed from Thomson to Ashland, commissioners appointed by the president, under the charter, examined it, and reported that it was completed in accordance with the requirements of the act, and the land department thereupon issued patents to the lands appertaining to this portion of the railroad. The company constructed its road from Thomson to Ashland over hill and dale, through forest, swamp, and morass, in reliance upon these decisions, and in the belief which they induced that it would thereby earn these lands; and it has been operating this railroad for more than a decade. While this construction was proceeding, congress took no action, under section 9 of the charter, on account of any breach of the conditions thereof by the company; the government brought no suit to avoid the decisions of these tribunals to which it had intrusted the power to hear and determine these questions, and gave no warning that it would ever question them; but now, more than 10 years after the road was built, after the government has secured the railroad, the advanced price of the even-numbered sections which it retained within the limits of the grant, and the settlement, occupation, and sale of its otherwise worthless lands which the railroad has induced, it asks this court of equity to strip this company of the lands which it promised to convey, and did convey, in consideration of the construction of the railroad, because that railroad was not built within the time fixed in the act. In other words, it asks this court to relieve it of the burdens while it retains the benefits of a contract which it not only permitted, but actively induced, the corporation to perform out of time, and which it has itself executed. There is no equity in this prayer. The same fundamental rules of right and justice govern nations, municipalities, corporations, and individuals. The equities of the United States appeal to the conscience of the chancellor with no greater or less force than do those of a private individual under like circumstances. "A court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can attach upon it so as to give any jurisdiction." Boone v. Childes, 10 Pet. 177, 210; Illinois Trust & Savings Bank v. City of Arkansas City, 40 U. S. App. 257, 294, 22 C. C. A. 171, 193, and 76 Fed. 271, 293; U. S. v. Winona & St. P. R. Co., 32 U. S. App. 272, 291, 15 C. C. A. 96, 108, and 67 Fed. 948, 960. The act of the railroad company in building its road and receiving the land pertaining thereto was commendable. If one is unable to perform his promise at the time agreed upon, it is not wrong, either in morals

or in law, but eminently just and right, that he should perform it thereafter, especially when the promisee accepts and requests it. Courts of equity sometimes enforce the specific performance of a contract, but they never undo its execution when it has been performed on the one hand, and its performance has been accepted on the other, with a full knowledge on the part of both parties of the facts which conditioned its completion.

In the second place, when the corporation presented its map of definite location to the land department in 1882, and its selection of its eastern terminus in 1884, the only objection to their acceptance was that they were out of time.    But the United States had the right to waive this objection, and to approve the location and selection notwithstanding this fact, and when it did so, and the road was constructed in reliance upon it, that waiver was irrevocable.    The government intrusted the power and imposed the duty to consider and determine whether or not this waiver should be made to the officers of the land department, and they waived the delay, and approved the location and selection.    These adjudications' of this department stand unchallenged.    No appeal was taken from them.    They have not been set aside for fraud, error, or mistake.    They therefore have all the force of judicial decisions, and conclude the question.    Hartman v. Warren, 40 U. S. App. 245, 250, 22 C. C. A. 30, 33, and 76 Fed. 157, 159, 160; Bogan v. Mortgage Co., 27 U. S. App. 346, 350, 11 C. C. A. 128, 130, and 63 Fed. 192, 195; Railway Co. v. Sage, 36 U. S. App. 340, 355, 17 C. C. A. 558, 567, and 71 Fed. 40, 49.

Finally, the counsel for the government calls attention to the facts that the line of the railroad of the Portage, Winnebago & Superior Railroad from Bayfield to Superior was on the same general route as that of the Northern Pacific Company, that the grant to the former company antedated the grant to the appellee (13 Stat. 67), that the Portage Company filed the map of definite location of its line from Bayfield to Superior on November 10, 1869, that the grant to the appellee overlaps this earlier grant to some extent, and that the lands covered by the earlier grant were withdrawn from entry, and remained so withdrawn, until after the appellee filed its map of definite location of this part of its line on July 6, 1882; and he suggests that the legal effect of these facts is—First, that under section 3 of the charter of the Northern Pacific Company its grant was diminished by the amount of lands within the limits of the grant to the Portage Company; and, second, that all the lands within the limits of the grant to the Portage Company were excepted from the grant to the appellee. Upon examination of the record, however, we find that it is impossible to determine from the facts before us what the effect of these contentions, if sustained, would be, or whether or not they would have any effect upon the right of the appellee to the particular tract of land here in question.    The case has evidently not been tried with any reference to their consideration.    We therefore dismiss them with the remark that our silence does not indicate in any way the inclination of our minds concerning their soundness.

Our conclusion upon the facts of this record is that the Northern Pacific Railroad Company never selected any other place than Ash-

land as the eastern terminus of its railroad; that it selected a point on Lake Superior, in the city of Ashland, as its eastern terminus in 1884; that this selection was accepted and approved by the land department; that it had not forfeited or lost the power of selection when this choice was made; and that this point in the city of Ashland is the eastern terminus of the Northern Pacific Railroad. Railway Co. v. Doherty, 100 Wis. 39, 75 N. W. 1079; U. S. v. Northern Pac. R. Co., 41 Fed. 842.

The questions presented in this case are of considerable moment although the quantity of land involved in this particular suit is small. It is important to settlers and occupants of the lands within the limits of the grant to the Northern Pacific Company between Thomson and Ashland, to the United States, and to the railroad company that the title to these lands should be quieted, and that doubts and fears concerning it should be dispelled. For this reason we have been constrained to examine and consider all the facts in the record before us, to decide the question of fact whether or not the company selected Ashland as its eastern terminus, on its merits, regardless of previous adjudications, and to briefly state the reasons which have led us to the conclusion we have announced. We are all of the opinion that the company duly selected Ashland. If, however, we had been led to give a different answer to this question of fact, the decree below could not have been reversed, or the patent in question set aside, in this case. The question what place the company actually selected as the eastern terminus of its railroad was a question of fact, which was necessarily decided by the land department when it issued the patent; and while the question of law whether or not the company had the right to select that point under its charter may be reviewed by the courts, this question of fact is not open to their consideration, until it is first made to appear that the decision of this question by the land department was induced by fraud or mistake. There is no claim that it was caused by fraud. One who would attack a patent for a mistake of fact in the decision of the questions which condition its issue must distinctly plead and clearly prove the evidence before the land department from which the mistake resulted, the particular mistake that was made, the way in which it occurred, and the fact that, if it had not been made, the decision would have been otherwise, and the patent would not have issued, before any court can enter upon the consideration of any issue of fact determined by the department. U. S. v. Atherton, 102 U. S. 372, 374; U. S. v. Budd, 144 U. S. 154, 167, 168, 12 Sup. Ct. 575; U. S. v. Mackintosh, 56 U. S. App. 483, 490, 29 C. C. A. 176, 179, and 85 Fed. 333, 336; U. S. v. Throckmorton, 98 U. S. 61, 66, 68; Marquez v. Frisbie, 101 U. S. 473, 476. There was no plea or proof of this character in this case. The only averment of mistake in the bill is that the ministerial officers of the United States, "through inadvertence and mistake, conveyed by patent the above-described land to the Northern Pacific Railroad Company under the erroneous impression and mistaken belief that the said tract was lying and being within the limits of the aforesaid grant to said Northern Pacific Railroad Company," and there is no evidence whatever upon this subject. It does not appear in the bill or in the

proofs in any way what evidence was before the land department upon the question of the selection of Ashland as the eastern terminus of its railroad by this company when that department decided that it had made this selection. It does not appear whether all or any of the evidence presented to the court below was before that department when it made its finding upon this question of fact, or whether its mistake was in overlooking some fact agreed upon, misreading some documentary evidence, or in what it consisted. The extraordinary powers of a court of equity cannot be invoked to set aside a solemn judgment of the land department upon a question of fact on a mere general averment that it was rendered by mistake or procured by fraud. The nature of the mistake, and the manner of its occurrence, or the particulars of the fraud must be shown before such a judgment can be successfully assailed. The decree below is affirmed.