HUMBIRD et al. v. AVERY et al.

(Circuit Court, D. Minnesota, Fifth Division.   August 29, 1901.)

1. PUBLIC LANDS—NORTHERN PACIFIC GRANT—CONSTRUCTION OF ACT FOR SETTLEMENT OF CONFLICTING CLAIMS.

Act July 1, 1898 (30 Stat. 620), was enacted for the purpose of settling without litigation, with the full consent and through the voluntary action of the parties, all disputes relating to lands which arose through the conflicting rulings of the land department as to the eastern terminus of the Northern Pacific Railroad as affecting its land grant, in so far as such lands had not been disposed of by the railroad company. Such act, which was accepted by the company, gave to every purchaser or settler claiming in good faith any of such lands through any law of the United States or ruling of the land department, whose right attached prior to January 1, 1898, the option to retain such lands or transfer his claim, and provided that, in case he elected to retain the land claimed, the railroad company, on executing a relinquishment, should be entitled to select other lands in lieu thereof. *Held*, that such act became operative from the date of its passage, and that the railroad company, having accepted the same, could not thereafter convey to another any right in the lands to which it applied, except subject to its provisions, by which the company was bound to relinquish its claim to such lands as the settlers or purchasers from the United States elected to retain; since any other construction of the act would enable the company, at its option, to render it nugatory.

2. SAME.

Such act applies as well to lands which had been patented prior to January 1, 1898, as to those to which the rights of settlers and purchasers were then inchoate, both classes being equally within its purview. It is immaterial that the land department had lost jurisdiction over the lands patented, since the act does not require the department to determine any conflicting claims, but merely to perform the ministerial duties of notifying settlers and purchasers of the option given them, and of furnishing to the railroad company a list of the lands which they elect to retain, upon which it becomes the duty of the company, under the provisions of the act itself, to execute the proper relinquishments therefor.

3. SAME—JURISDICTION OF COURTS—INTERFERENCE WITH LAND DEPARTMENT.

Neither a federal nor state court can properly assume to determine and adjudicate the rights of contesting claimants to public lands while the matter is pending before the land department.

4. SAME—INJUNCTION.

A court of equity will not interfere by injunction as between two contesting claimants of public lands, which are still within the jurisdiction of the land department, unless to prevent waste which will result in serious and permanent injury to the land.

In Equity.   Suit to determine conflicting claims to public lands.

Billson, Congdon & Dickinson and H. Oldenburg, for complainants.

H. H. Hoyt, Jaques & Hudson, Towne & Harris, M. H. Stanford, John G. Williams, and S. H. Moer, for defendants.

LOCHREN, District Judge.   The complainants above named, claiming the equitable title and ownership of very numerous tracts or parcels of land in the state of Minnesota lying in odd-numbered sections north of the line of the Northern Pacific Railroad, and east of the meridian of Duluth, and within the limits of the indemnity

belts of land granted by congress in aid of the construction of said railroad, under conveyances or contracts of sale from the Northern Pacific Railway Company, which is the successor of the Northern Pacific Railroad Company, and entitled to all rights of said last-named company in said lands, filed this bill against the numerous defendants named therein, who are respectively settlers upon parcels of said lands, or purchasers of parcels thereof from the United States, or grantees of such purchasers, to have adjudicated and established the right and title of complainants to said lands, and to have the claims of defendants thereto adjudged invalid, and disposed of as clouds upon the right and title of complainants; and for other relief specifically asked or generally prayed for. The answers of the answering defendants respectively assert their rights to lands as lawful settlers thereon under the laws of the United States, or under purchases from the United States. The controversy in regard to the title to these lands arose from conflicting action and rulings of the land department of the United States respecting the point of location on Lake Superior of the eastern terminus of the Northern Pacific Railroad, and as to the right of the Northern Pacific Railroad Company to receive any lands, under its land grant, in respect to that portion of its railroad which was built and operated between Thomson Junction, in the state of Minnesota, and Ashland, in the state of Wisconsin. The map of definite location of that portion of said railroad was transmitted to the secretary of the interior July 3, 1882, and was accepted, and the land grant adjusted to the line shown thereon, and the lands appertaining to that portion of the railroad withdrawn from sale or entry by order of the secretary. On August 28, 1884, the board of directors of the Northern Pacific Railroad Company, by resolution, fixed and located the eastern terminus of said railroad at Ashland, and transmitted a copy of such resolution to the land department December 3, 1884, and that was accepted by the land department as establishing such eastern terminus. That portion of the railroad was constructed, and was accepted by commissioners appointed by the president; and said Northern Pacific Railroad Company, pursuant to directions of the secretary of the interior, made and filed its lists of selections of lands in said indemnity belts in lieu of lands lost to it in its place limits, including all the lands in controversy in this suit; which lists of selected lands were accepted and approved by said land department, and some of the same were afterwards patented to said Northern Pacific Railroad Company, but not including any which are embraced in this suit. But thereafter, on August 27, 1896, the secretary of the interior ruled and decided that the eastern terminus of said railroad was at the city of Duluth, and that its land grant did not extend east of the meridian of that city; and thereupon, by his order, said lists of selections were canceled, and the land so selected opened for sale and entry as unappropriated public land; and thereafter, and conformably with such ruling of the secretary of the interior, the entries and purchases were made under which the present defendants now claim.

Most of the foregoing matters will be found stated more at length

in the reports of the cases of U. S. v. Northern Pac. R. Co., 37 C. C. A. 290, 95 Fed. 864; U. S. v. Northern Pac. R. Co., 177 U. S. 435, 20 Sup. Ct. 706, 44 L. Ed. 836; and Doherty v. Railroad Co., 177 U. S. 421, 20 Sup. Ct. 677, 44 L. Ed. 830. These decisions finally adjudged that the eastern terminus of said railroad was at Ashland; and on the filing, on April 16, 1900, of the supreme court decisions just referred to, the secretary of the interior revoked the order canceling said lists of selections, and reinstated the said lists. Prior to July 1, 1898, the supreme court of the state of Wisconsin, in the Doherty Case, above cited, then pending before it, had adjudged and decided that the eastern terminus of said railroad was established at Ashland; and this court, in the other above-cited case, then pending before it, had rendered judgment to the same effect; and on that date, by provisions contained in 30 Stat. 620, c. 546, congress enacted:

"That where, prior to January first, eighteen hundred and ninety eight, the whole or any part of an odd numbered section in either the granted or the indemnity limits of the land grant to the Northern Pacific Railroad Company, to which the right of the grantee or its lawful successor is claimed to have attached by definite location or selection, has been purchased directly from the United States or settled upon or claimed in good faith by any qualified settler under color of title or claim of right under any law of the United States or any ruling of the interior department, and when purchaser, settler or claimant refuses to transfer his entry as herein provided, the railroad grantee or its successor in interest, upon a proper relinquishment thereof, shall be entitled to select in lieu of the land relinquished an equal quantity of public lands, surveyed or unsurveyed, not mineral or reserved, and not valuable for stone, iron or coal, and free from valid adverse claim or not occupied by settlers at the time of such selection, situated within any state or territory into which such railroad grant extends, and patents shall issue for the land so selected as though it had been originally granted," etc.

This act further provided that the secretary of the interior should ascertain, prepare, and deliver to the railroad grantee or its successor in interest lists of the tracts of land so purchased or settled upon and now claimed by the purchasers or occupants, their heirs or assigns; and that the right, title, and interest of the railroad grantee so relinquished should revert to the United States, and the lands be treated as if the grant had never included them. The act further provided that the railroad grantee, or its successors in interest, should accept as conclusive, in respect to the lands to be relinquished, the lists so to be made by the secretary of the interior; but should not be bound to relinquish "lands sold or contracted by it, or lands which it uses or needs for railroad purposes, or lands valuable for stone, iron, or coal." The act further provides that all qualified settlers, their heirs or assigns, who, prior to January 1, 1898, purchased or settled upon, or claimed in good faith under color of title or claim of right, under any law of the United States or any ruling of the interior department, any part of an odd-numbered section in either the granted or indemnity limits of said land grant, may, in lieu thereof, transfer their claims to other public lands, specified, with credit for their residence and improvements; and that the secretary of the interior should give notice to such persons of their option to take lieu lands before delivering the lists

to the railroad grantee or its successor in interest. This act of July 1, 1898, was duly accepted by the Northern Pacific Railway Company on July 13, 1898, and before it had sold or contracted to sell to complainants, or to any one, any of the lands described in the bill.

The obvious purpose of this act was to provide a certain, speedy, and equitable way in which all controversies between the railroad grantee or its successors and purchasers or settlers upon odd-numbered sections within the place or indemnity limits of the land grant, who claimed by color of any law of the United States or any ruling of the land department, should be settled and adjusted without contest or litigation either in the land department or in the courts. The railway company, by its express acceptance of the act, became bound by its provisions, and obligated to carry out its terms. By its terms, each of such purchasers and settlers is to be notified by the secretary of the interior of his option to transfer his entry or claim and take other lands in lieu thereof. If he takes such lieu lands, he relinquishes his former land, and this ends his contest with the railroad grantee. As to those purchasers or settlers who elect to retain their claimed lands, the railroad grantee or its successor, on receiving lists of such lands from the secretary, must relinquish the lands so listed, and may take lieu lands therefor, and the relinquished lands revert to the United States, and stand as if never included in the land grant, and the controversies about them are ended. But the complainants, while not conceding that by the act of July 1, 1898, it is made obligatory on the railroad grantee or its successor to relinquish any lands, contends that, if such obligation does arise as to any lands, it is only as to lands which shall not have been sold or contracted to be sold by the railroad grantee or its successor prior to the time when such lands shall have been included by the secretary of the interior in lists of contested lands served upon the railroad grantee or its successor, as required by that act. They claim, therefore, that the lands described in the bill are not affected by that act, because they were "sold or contracted" by the railway company to the complainants January 19, 1900, after the passage of said act, but before the service upon the railroad grantee or its successor, by the secretary of the interior, of any lists of lands claimed by purchasers or settlers, and therefore to be relinquished by the railroad grantee or its successor. This contention of the complainants is untenable. The act refers to conditions existing at the time of its passage. It does not embarrass the railroad grantee by requiring it to relinquish any land which before the passage of that act it had sold or contracted; neither does it provide for its own practical nullification by excepting from its provisions lands which the railroad grantee might thereafter choose to sell or contract, as in this immense sale of lands to the complainants; and after the passage and acceptance of the act the complainants could acquire no rights in the land not in subordination to its provisions. The act speaks from its passage. It does not make any rights or obligations dependent upon the celerity or tardiness of the secretary in the performance of the duties which the act imposes upon him.

It appears that a very few of the defendants claim under patents issued before January 1, 1898, and complainants contend that said act of July 1, 1898, has no application to lands so patented, and that such has been and is the ruling of the land department. 28 Land Dec. Dep. Int. 103; Id. 470; Wasmud v. Railroad Co., 29 Land Dec. Dep. Int. 224, 226. It is apparent from these citations that such has been the construction placed upon that act by the secretary of the interior. I believe, however, that such construction of the act is erroneous. It appears from the statements in one of these citations that after the passage of said act some lands covered by its provisions were inadvertently patented, and the views of the secretary as to the scope of the act, and the powers and duties of the land department in carrying it into effect, appear in the instructions of Acting Secretary Ryan to the commissioner of the general land office, June 3, 1899 (28 Land Dec. Dep. Int. 471):

"Paragraph seven of the regulations approved February 14, 1899 (28 Land Dec. Dep. Int. 103), issued under the act of July 1, 1898, states that: 'Since the issuance of patent terminates the jurisdiction of the land department over the lands patented and exhausts its power to examine and decide upon claims to such lands, and since this act manifestly refers to conflicting claims to lands which have not passed beyond the jurisdiction of the land department, it follows that its provisions are confined to unpatented lands, and that lands which have been patented are not the subject of relinquishment and cannot be made the basis of a lieu selection under this act.' This portion of the paragraph can only relate to such lands as had been patented prior to the act of July 1, 1898, and as to all such lands said act is without application. But all conflicting claims coming within the provisions of said act, to land which remained unpatented July 1, 1898, should be disposed of in accordance with the provisions of that act. The patenting of all lands which were on July 1, 1898, the subject of such conflicting claims without following the provisions of said act, was in violation of its terms, and therefore erroneous. To the end that the benefits intended to be extended by said act may be still secured to those entitled thereto, and to avoid possible and unnecessary litigation in the courts as a result of the inadvertent or erroneous issuance of patents since July 1, 1898, in such cases, the following regulation is added to those adopted February 14th, last, under said act, namely: '(47) Where any portion of an odd-numbered section within the limits of the grant to the Northern Pacific Railroad Company coming within the provisions of the act of July 1, 1898, as herein construed, has been patented without following the provisions of that act, the individual claimant will, notwithstanding the issuance of such patent, be advised, in the manner prescribed by paragraph 18, of the option accorded him by said act. If the patent was issued to him, and he elects to relinquish his claim, he will be required to make reconveyance of the land to the United States in the manner prescribed by paragraphs 24, 25, and 26; but if he elects to retain the land patented it will be listed according to paragraph 23, with a view to its relinquishment by the railroad company. If the patent was issued to the railroad company, and the individual claimant elects to retain the land so patented, the company will be required to make reconveyance thereof to the United States according to paragraphs 24 and 26, whereupon the individual claimant may perfect title thereto, and the railroad company may select other lands in lieu thereof as in other cases.' "

The situation at the time of the passage of the act of July 1, 1898, was this: By reason of the erroneous ruling of the secretary of the interior as to the location of the eastern terminus of said railroad, and his revocation of his prior approval of lawful selections by the railroad company of indemnity lands, and permitting sales and en-

tries of such selected lands as unappropriated, he had introduced confusion and conflict in respect to the right to such lands, which was beginning to be litigated in the courts; as the suits which resulted in the supreme court decisions above cited had then been commenced, and very much litigation seemed probable. The fact that patents had issued in a few instances would not end such disputes as to the lands so patented, as courts would adjudge the patentee in any case to hold the title in trust for the other party, wherever the other party had clearly the right to the land. The quieting of claims and titles to such a vast area of land was matter of public concern, and it was proper and beneficent legislation on the part of congress to thus provide for the settlement and ending, with the full consent, and through the voluntary action, of the parties in each instance, of all disputes existing in the land department in respect to the unpatented lands, as well as all disputes which might arise in the courts as to whether patents for the patented land had been issued by the land department to the right parties. This act gives the option to keep or relinquish the disputed land to the individual claimant in every instance. If he elects to retain that land, it is to be listed by the secretary in lists to be furnished to the railroad claimant, who must relinquish, and whose consent to this was given by its acceptance of the act. The statement of the secretary, in his instructions above quoted, that "the issuance of patent terminates the jurisdiction of the land department over the lands patented, and exhausts its power to examine and decide upon claims to such lands," while true, is wholly irrelevant in respect to all lands affected by the act of July 1, 1898. That act does not provide for any examination or decision whatever, by the land department, of the merits of any claims to any lands. The acts required to be done by the secretary of the interior are merely ministerial,— first, to offer the option to the individual claimant, and, if the land is by him relinquished, to require such instrument as will make the relinquishment effectual. If he refuses to relinquish, then the secretary's duty is to place the land on the list respecting which relinquishment is to be required of, and cannot be refused by the railroad claimant; the lists so furnished being conclusive. The other statement in the secretary's instructions, that the act "manifestly refers to conflicting claims to lands which have not passed beyond the jurisdiction of the land department," is stated as a corollary to the last previously quoted statement, and is "manifestly" incorrect, as no sentence in that act favors such limited construction. On the contrary, its broad terms include patented as well as unpatented lands, respecting which such conflicting claims existed. There can be no more difficulty in executing the act in respect to lands coming within its terms, which were patented before its passage, than in respect to the lands which were inadvertently patented after the passage of the act, and about which the secretary finds no difficulty. The patents last referred to, though erroneously issued, were not void, and effectually passed the title, and exhausted the jurisdiction of the land department. Moore v. Robbins, 96 U. S. 530, 532, 24 L. Ed. 848. But the secretary very properly did not consider that this at all dis-

abled him from performing the ministerial duties devolved upon him by the act of July 1, 1898, in respect to the lands so patented. The same is true respecting the lands patented before the passage of the act, and the procedure which he directs to be adopted by paragraph 47 of his instructions is as appropriate and effectual in the one case as in the other.

Complainants' contention that the act of July 1, 1898, only applies to lands claimed by "settlers," cannot be maintained. The language employed is broad enough to include all purchasers from the United States, under any law, or ruling of the land department.

In respect to about 4,500 acres of the land described in the bill and claimed by the complainants, it appears by the exhibit attached to the bill that the entries thereof by the individual claimants were made later than January 1, 1898, and therefore that the act of July 1, 1898, does not apply to such lands. But the same exhibit shows that none of these lands have been patented to any one. It therefore appears that the legal title to these lands is not in either the complainants or defendants, but still in the United States, and that the contests as to the right to these lands are still pending, or may be prosecuted, before the land department of the United States. While the matters are in this condition, it is improper for a court to assume to adjudicate the rights of the contesting parties. The language of Mr. Justice Miller in Marquez v. Frisbie, 101 U. S. 473, 475, 25 L. Ed. 800, is applicable:

"We have repeatedly held that the courts will not interfere with the officers of the government while in the discharge of their duties in disposing of the public lands, either by injunction or mandamus. Litchfield v. Richards, 9 Wall. 575, 19 L. Ed. 681; Gaines v. Thompson, 7 Wall. 347, 19 L. Ed. 62; Secretary v. McGarrahan, 9 Wall. 298, 19 L. Ed. 579. And we think it would be quite as objectionable to permit a state court, while such a question was under the consideration and within the control of the executive department, to take jurisdiction of the case by reason of their control of the parties concerned, and render decree in advance of the action of the government, which would render its patents a nullity when issued."

It is just as improper for a federal court as for a state court to assume to determine and adjudicate the rights and equities of contesting claimants for public lands while the matter is still pending before the land department.

The only other ground upon which the complainants urge their right to equitable relief is as to two 40-acre tracts in section 19, township 54, range 12, claimed by the defendant Michael Kelley under conveyance from Malcolm A. McDonald, the entryman. The proof shows that said Kelley has caused to be cut and removed from said two tracts a large amount of pine timber, including substantially all the pine timber of merchantable value growing thereon, and complainants contend that they are entitled to an injunction to restrain said Kelley from cutting or removing any more timber from said tracts, and to a decree against him for the value of such pine timber already cut and removed by him, such value to be ascertained by reference to a master. But the complainants cannot be awarded the value of the pine timber so cut and removed without an adjudication in this suit that they have at least the equitable

right to the land, and such adjudication may not be made while jurisdiction to determine that matter remains in the land department as it does until patent for the land shall issue. It is unnecessary to decide whether a case may not arise when, even while the disputed question as to the rights of contesting parties to a tract of public land is pending or cognizable before the land department, a court of equity may properly interfere, by injunction at the suit of one of the claimants, to prevent the other claimant from despoiling the land by waste, and appropriating its substantial value, by denuding it of all its merchantable timber, before any final decision upon the disputed claims by the land department, which is only rendered by issuing the patent. I think a court of equity should in such cases refuse interference by injunction to preserve merely technical rights,—the status quo,—but only (if at all) to prevent serious and substantial injuries. Here it seems from the proofs that an injunction will be practically ineffectual, as the merchantable timber of any substantial value has already been taken and removed from the land. On the hearing no technical objection to any pleading was urged or has been considered, as the parties apparently desired a decision on the merits. Decree will be entered dismissing the bill, with costs.